OFFICE COPY

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

08 CV 7140

GLENCLOVA INVESTMENT CO., a Cayman
Islands corporation,

               Plaintiff,

      - against -

TRANS-RESOURCES, INC., a
Delaware corporation, and TPR INVEST-
MENT ASSOCIATES INC., a Delaware corpo-
ration,

            Defendants.

Case No. _____

AUG 11 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Glenclova Investment Co. ("Plaintiff"), by its undersigned attorneys, for

its Complaint herein, alleges on knowledge as to itself and its own actions and on information

and belief as to all others, as follows:

### SUMMARY

1.    Plaintiff seeks a decree of specific performance compelling Trans-

Resources, Inc. ("Trans-Resources") and TPR Investment Associates, Inc. ("TPR," and with

Trans-Resources, "Defendants") to honor their obligations under a Stockholders Agreement (the

"Stockholders Agreement") between and among Defendants, Plaintiff and one other Trans-

Resources stockholder affiliated with Plaintiff, TR Investors, LLC. The Stockholders Agree-

ment is dated March 1, 2001, at which time TPR held a majority of the outstanding Trans-

Resources shares and Arie Genger ("Genger"), chairman of Trans-Resources' board of directors,

held a majority interest in, and controlled, TPR. In particular, Plaintiff seeks to enforce its

rights to acquire the Trans-Resources shares that were held by TPR, which would give Plaintiff a majority of the shares and the ability to control Trans-Resources.

2.    Under the Stockholders Agreement, Plaintiff was entitled to written notice from TPR and the opportunity to exercise its right of first refusal before any proposed transfer of its Trans-Resources shares, and to written notice of the change in control of TPR. Upon the change in control of TPR and/or the purported transfers by TPR of Trans-Resources shares, Plaintiff had the right to purchase TPR's shares of Trans-Resources at the value at the time of the change in control or the purported transfers.

3.    On June 13, 2008, Plaintiff first learned that in October 2004, control of TPR was transferred to Genger's former wife, and TPR then purported to transfer approximately three-quarters of its Trans-Resources shares to trusts for the benefit of Genger's two adult children and the balance of those shares to Genger himself, all in breach of the Stockholders Agreement. Before that date, Plaintiff had no knowledge of any of these events. The stock transfer and change in control restrictions in the Stockholders Agreement were carefully designed and negotiated to assure that TPR (or a similar Genger-controlled entity) would remain the Trans-Resources stockholder and that, except in the event of his death, Genger would at all times maintain a majority of the equity interests in TPR and directly control a majority of the voting power of TPR. Plaintiff was not interested in sharing ownership of Trans-Resources with anyone other than a Genger-controlled TPR or Genger himself (upon due notice). This need to restrict transfers and changes in control away from Genger was a material component to Plaintiff's agreement to become a stockholder by converting approximately $230 million of Trans-Resources debt to equity and not enforcing its creditor rights and was in part specifically intended to prevent transfers to Genger's former wife and to his adult children (or entities in

2

which they held a majority of the equity interests or the voting power) with each of whom Genger ultimately engaged, and continues to engage, in protracted and bitterly contested litigation. Accordingly, transfers of the nature purportedly made by TPR are specifically prohibited under the Stockholders Agreement without, among other things, affording the Plaintiff with a right of first refusal which was not provided by TPR. Likewise, and for the same reasons, the Stockholders Agreement restricts any change in control of TPR away from Genger. In either of these events, Plaintiff has the right to acquire all of the Trans-Resources shares held by TPR at the time of the change in control of TPR or the purported transfers. Genger knew of these restrictions when he determined not to provide any of the notices required or allow the other stockholders the rights they very carefully negotiated for in the Stockholders Agreement. Only on June 13, 2008, when on behalf of Trans-Resources Genger was forced to seek additional capital from the other Trans-Resources stockholders to prevent foreclosures by its lender, did Genger, recognizing that he was faced with no alternative, finally tell Plaintiff and TR Investors, LLC of the TPR change in control and the prohibited transfers of Trans-Resources shares four years earlier.

4.    Since learning of these events, Plaintiff has discussed with Genger and Trans-Resources Plaintiff's right to acquire TPR's shares of Trans-Resources, but Genger has denied that Plaintiff has any such right, thereby indicating their intention to repudiate and further breach the Stockholders Agreement, which will cause Plaintiff imminent irreparable harm. Plaintiff's acquisition of these shares in accordance with the Stockholders Agreement is critical to Plaintiff's ability to protect its investment in Trans-Resources and not be faced with the very change in ownership of Trans-Resources that it so carefully negotiated to prevent when surrendering its rights as Trans-Resources' principal creditor and converting its debt to equity.

3

5.    Trans-Resources is not a public company with a ready market for its shares. Thus, a determination of monetary damages, including the value of the opportunity to control Trans-Resources, would be difficult and can be avoided by compelling Defendants to comply with the Stockholders Agreement. Thus, specific performance is appropriate, practical and necessary to remedy Defendants' breaches and anticipatory breaches of the Stockholders Agreement. Moreover, this relief is explicitly provided for in the Stockholders Agreement (¶ 6.3): "any violation of this Agreement . . . cannot be compensated for by damages, and any aggrieved party shall have the right . . . of obtaining specific performance. . . ."

6.    Alternatively, to the extent specific performance is not granted, Plaintiff seeks damages for Defendants' breaches of the Stockholders Agreement in an amount to be determined at trial.

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2), because the parties are diverse, and the amount in controversy has a value of not less than $75,000.00, exclusive of interest and costs.

8.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(a), because Defendants reside here, and a substantial part of the events or omissions giving rise to the claims occurred here. Additionally, the parties agreed in the Stockholders Agreement (¶6.4) that the exclusive place of jurisdiction for any action thereunder would be in the courts of the United States of America sitting in the Borough of Manhattan.

## PARTIES

9.     Plaintiff is a Cayman Islands corporation with its principal place of business in the Bahamas. Plaintiff is a shareholder of Trans-Resources and holds 1,246.8572 shares, or 21.97%, of the authorized and issued common stock.

10.    Defendant Trans-Resources is a Delaware corporation with its principal place of business in New York City. Trans-Resources, through certain subsidiaries, has more than 600 employees and produces fertilizers, plant nutrients and irrigation systems.

11.    Defendant TPR is a Delaware corporation with its principal place of business in New York City. Upon entering into the Stockholders Agreement, TPR was the majority shareholder of Trans-Resources, and held 3,000 shares, or 52.85%, of the authorized and issued common stock.

12.    Non-party TR Investors, LLC, a New Jersey limited liability company, is the other shareholder of Trans-Resources and holds 1,429.5856 shares, or 25.18%, of the authorized and issued common stock. TR Investors has assigned to Plaintiff its rights to purchase TPR's shares of Trans-Resources.

## STATEMENT OF FACTS

**The Stockholders Agreement Restrictions On Transfers And Changes In Control**

13.    In March 2001, Trans-Resources and its stockholders entered into the Stockholders Agreement, a true and correct copy of which is attached as Exhibit A. TPR then was majority owned and controlled by Genger.

14.    Under the Stockholders Agreement (¶ 3.2(a)(v)), a change in control of TPR provides the other stockholders with a right to purchase TPR's shares of Trans-Resources.

15.    Similarly, the Stockholders Agreement (¶ 3.2(a)(iv)) provides that certain purported transfers of Trans-Resources shares by TPR provide the other stockholders with a right to purchase those shares.

5

16.    Moreover, under the Stockholders Agreement (¶ 2.4) "[a]ny attempt by [TPR] to transfer Shares in violation of this Agreement *shall be void*, and [Trans-Resources] . . . will not effect such a transfer or treat any alleged transferee as the holder of such Shares." (Emphasis added)

## The Change In Control Of TPR

17.    Without the notice to Plaintiff required by the Stockholders Agreement, in October 2004, Arie Geiger arranged for the transfer of all the equity interests in TPR to Dalia Genger, his former spouse.

18.    This change of control of TPR triggered Plaintiff's right to purchase the shares of Trans-Resources then owned by TPR.

## The Improper Transfers Of TPR's Trans-Resources Shares

19.    On or about October 29, 2004, and without notice to Plaintiff, TPR purportedly conveyed approximately three-quarters of its Trans-Resources shares to trusts for the benefit of Arie and Dalia Genger's two children and a remaining minority position to Arie Genger individually.

20.    Under the Stockholders Agreement, the purported transfers were void and triggered Plaintiff's right to purchase those shares.

21.    As a result, TPR continues to be the owner of such shares, subject to Plaintiff's right to purchase them at a price to be determined in accordance with the Stockholders Agreement.

22.    Defendants' refusals to honor Plaintiff's rights to purchase TPR's shares of Trans-Resources are material and continuing breaches of the Stockholders Agreement, which

6

remains in full force and effect. Plaintiff hereby seeks to enforce Defendants' obligations thereunder.

## FIRST COUNT

### Declaratory Relief

23.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

24.    The Stockholders Agreement is a valid and enforceable contract between the parties thereto.

25.    The change in control of TPR triggered Plaintiff's right under the Stockholders Agreement to acquire the shares of Trans-Resources then held by TPR at the value of the shares at the time of the change in control.

26.    TPR's subsequent purported transfers of its Trans-Resources shares violated the Stockholders Agreement and also triggered Plaintiff's right under the Stockholders Agreement to acquire those shares at the value thereof at the time of the purported transfers.

27.    Plaintiff was not given written notice of these events (or, in the case of the purported transfers, its right of first refusal) as required under the Stockholders Agreement.

28.    Therefore, Plaintiff is entitled to a judgment declaring that (i) the purported Trans-Resources share transfers by TPR are void, and TPR remains the sole and exclusive holder of those Trans-Resources shares, and (ii) Plaintiff is entitled exercise its right to acquire those Trans-Resources shares at the value thereof in October 2004.

## SECOND COUNT

### Specific Performance

29.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

30.    Under the Stockholders Agreement, the change in control of TPR and the subsequent purported transfers of TPR's shares of Trans-Resources triggered Plaintiff's rights to purchase those shares at the value thereof in October 2004.

31.    Plaintiff is ready, willing and able to perform its contractual obligations regarding such a purchase, but Defendants have indicated that they will refuse to honor their obligations under the Stockholders Agreement.

32.    Defendants have thus anticipatorily breached the Stockholders Agreement.

33.    Absent equitable relief in the form of a judgment requiring Defendants to specifically perform their obligations under the Stockholders Agreement, Plaintiff will suffer irreparable harm.

34.    Plaintiff has no adequate remedy at law.

### THIRD COUNT

### Breach Of Contract

35.    Plaintiff repeats and realleges each of the foregoing allegations as if set forth fully herein.

36.    To the extent specific performance is not granted or sufficient to completely remedy Trans-Resources' and TPR's substantial and material breaches of the Stockholders Agreement, Plaintiff is entitled to an award of monetary damages to compensate for the breaches in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment:

(1)    declaring that (i) the purported Trans-Resources share transfers by TPR are void, and TPR remains the sole and exclusive holder of those Trans-Resources shares, and (ii) Plaintiff is entitled to exercise its right to acquire those Trans-Resources shares at the value

thereof in October 2004 by virtue of both, or either, of the change of control of TPR or the transfer by TPR of its shares of Trans-Resources;

      (2)    ordering Defendants to specifically perform their obligations under the Stockholders Agreement;

      (3)    alternatively, awarding damages to Plaintiff to remedy Defendants' breaches of the Stockholders Agreement; and

      (4)    awarding Plaintiff such other and further relief as the Court may deem proper, including attorneys' fees, costs and other expenses.

Dated: August 11, 2008

          SKADDEN, ARPS, SLATE,
          MEAGHER & FLOM LLP

          William P. Frank
          Four Times Square
          New York New York 10036
          (212) 735-3000

          - and -

          Anthony W. Clark
          Robert A. Weber
          Douglas D. Herrmann
          One Rodney Square
          P.O. Box 636
          Wilmington, Delaware 19899-0636
          (302) 651-3000

          *Attorneys for Plaintiff Glenclova Investment Co.*

1.6    Share Distributions. On the date hereof TPR owns 52.85% of the outstanding Shares and Investors and Glenclova collectively own 47.15% of the outstanding Shares. The Covered Stockholders agree that if any distributions are hereafter made on the Shares whether by dividend, liquidating distribution or otherwise (the aggregate amount of each such distribution to all Stockholders is hereinafter referred to as the "Distribution"), TPR agrees to transfer (a) if the Distribution is made before the exercise of the Bank's Shares Option, 1.85% of each Distribution and (b) if made after the exercise of the Bank's Shares Option, 1.785% of each Distribution, to one of the Representatives on behalf of the Non-TPR Stockholders as long as the Non-TPR Stockholders own any Shares. If at any time (i) the TPR Stockholders' aggregate percentage ownership of Shares becomes less than a majority of the outstanding Shares, (ii) the Bank's Shares Option is not exercised and terminates or (iii) the Shares issued to the Bank pursuant to the Bank's Shares Option are repurchased by the Company, TPR shall transfer or cause to be transferred such number of Shares (the "Balance Shares") to the then Non-TPR Stockholders, pro rata in accordance with their stockholdings, so that had such Shares been included in the Exchange Shares the Non-TPR Stockholders aggregate percentage ownership of Shares would upon issuance of the Exchange Shares have been 49% of the outstanding Shares, and upon such transfer of Shares TPR's obligation to transfer portions of Distributions shall terminate.

1.7    Stockholder Representative; Power of Attorney. Each Initial Non-TPR Stockholder hereby appoints and constitutes, and covenants and agrees that any Permitted Transferee thereof will appoint and constitute as a condition precedent to any such transfer, Investors and Glenclova or any of their respective designees as agents and attorneys-in-fact for the Non-TPR Stockholders (the "Representatives"), provided that there shall be no more than a total of two Representatives, for and on behalf of the Non-TPR Stockholders, to receive notices and communications hereunder and for

each Representative to act (without the other) pursuant to this Agreement on behalf of the Non-TPR Stockholders as to those matters and instances in which this Agreement provides that the Non-TPR Stockholders are required or permitted to act through the Representatives, including, without limitation, pursuant to Sections 1.2, 1.6, Article 5 and Section 6.5 of this Agreement, in which case a decision, act, consent or instruction of the Representative shall constitute a decision, act, consent or instruction of all the Non-TPR Stockholders, and shall be final, binding and conclusive upon each of the Non-TPR Stockholders; and the Company, TPR and each of its Permitted Transferees, and their respective officers, employees and agents, is hereby relieved from any liability to any person for any acts done by it in accordance with such decision, act, consent or instruction of the Representative. Notices or communications to the Representatives shall constitute notice to each of the Non-TPR Stockholders.

1.8    <u>Key Man Life Insurance</u>. The Company shall within ninety (90) days of the date hereof use its best efforts to obtain from financially sound and reputable insurers term life insurance on the life of Arie Genger in such amount as shall be requested by the Representatives. Such policies shall name the Representatives as loss payees and the cost of such policies shall be borne by the Representatives. Arie Genger hereby represents that he has no reason to believe that he is not insurable at standard rates and agrees to reasonably cooperate in the obtaining of such policies by making himself available for reasonably required medical examinations in connection therewith.

## ARTICLE 2

## RESTRICTIONS ON TRANSFER OF STOCK

2.1    General. From and after the date hereof, no Stockholder shall directly or indirectly, offer, transfer, sell, assign, pledge, encumber, hypothecate or otherwise dispose of any Shares (including any derivative transaction) (a) until after December 31, 2003, and, thereafter, only as provided in Articles 3, 4 and 5 of this Agreement, or (b) after written notice to the Company and the other Stockholders and, to the extent applicable, compliance with Section 3.2(a)(v), but subject to Section 3.7, to (i) in the case of either of the Initial Non-TPR Stockholders or their respective Permitted Transferees (A) to an entity or entities in which such Initial Non-TPR Stockholder or the Carmel Trust or any successor trust thereof (collectively, the "Trust"), owns not less than 20% of the economic interest and in which such Initial Non-TPR Stockholder or the Trust controls directly or indirectly by contract or otherwise not less than 30% of the voting power of such entity (provided, however, that no other person or group controls directly or indirectly 30% or more of the voting power of such entity), which entity becomes a party to this Agreement, or (ii) in the case of TPR or a Permitted Transferee thereof, to (w) Arie Genger, (x) any entity or entities in which TPR or Arie Genger directly owns a majority of the equity interest and directly controls a majority of the voting power (provided that if any such transfer is to an entity controlled by TPR, Arie Genger continues to directly hold at least a majority of the equity interest and voting power of TPR at the time of transfer (with the balance beneficially owned by either the current beneficial owners, each of which is currently a member of his immediate family, or by members of his immediate family or his lineal descendants or trusts of which they are the sole beneficiaries-in-interest) and he agrees with the Initial Non-TPR Stockholders to continue to maintain such ownership at all times thereafter), (y) the estate or Arie Genger or (z) any immediate family members or lineal descendants of Arie Genger,

or trusts of which they are the sole beneficiaries-in-interest, who receive such Shares in consequence of the death of Arie Genger, which transferee(s) become a party to this Agreement (the transferees described in the preceding clauses (b) (i) and (ii) being collectively called "Permitted Transferees"). It is the strong intent of the Stockholders to have as few Permitted Transferees as possible.

2.2     Shares Certificate Legend.  Each certificate for Shares shall have conspicuously written, printed, typed or stamped upon the face thereof, or upon the reverse thereof with a conspicuous reference on the face thereof, the following legend:

"THESE SHARES ARE SUBJECT TO CERTAIN TRANSFER RESTRICTIONS AND RIGHTS OF REPURCHASE AS SET FORTH IN THE STOCKHOLDERS AGREEMENT DATED AS OF MARCH 30, 2001 ON FILE WITH THE SECRETARY OF THE COMPANY."

2.3     Certain Definitions.  The words "sale," "sell," "transfer" and the like shall include any disposition by way of transfer (including any derivative transaction), with or without consideration, to any person for any purpose, but shall not apply to exchanges of securities on account of merger, consolidation, reorganization or any other similar transaction affecting all the securities of the Company.  The word "affiliate" shall have the meaning given in Rule 405 under the Securities Act of 1933, as amended (the "Securities Act").

2.4     Violations.  Any attempt by a Stockholder to transfer Shares in violation of this Agreement shall be void and the Company agrees that it will not effect such a transfer or treat any alleged transferee as the holder of such Shares.

## ARTICLE 3

## CERTAIN RIGHTS TO SELL AND PURCHASE

3.1    Right of First Refusal.

(a)    Subject to Sections 2.1 and 3.7 and Article 5 hereof, if a Stockholder (the "Selling Stockholder") shall desire to sell, assign or transfer any Shares held by it to any person other than a Permitted Transferee (the "Offered Shares") and shall be in receipt of a bona fide written offer to purchase the Offered Shares (the "Offer"), the following procedure shall apply.  The Selling Stockholder shall give to the Company and to each Covered Stockholder who is not the Selling Stockholder (the "Non-Selling Stockholders") written notice containing the terms and conditions of the Offer, including, but not limited to (i) the number of Offered Shares; (ii) the price per share; (iii) the method of payment; and (iv) the name(s) of the proposed purchaser(s); provided that for purposes of this Section 3.1, if the Selling Stockholder is (x) a TPR Stockholder, then only the Non-TPR Stockholders shall be deemed to be Non-Selling Stockholders; and (y) a Non-TPR Stockholder, then only the TPR Stockholders shall be deemed to be Non-Selling Stockholders.

An Offer shall not be deemed bona fide unless, among other things, the method of payment is cash, promissory notes or a combination of both, the Selling Stockholder has informed the prospective purchaser of its obligation under this Agreement and the prospective purchaser has agreed to become a party hereto and to be bound hereby, and the prospective purchaser is not an affiliate of the Selling Stockholder or an individual related to the controlling person of the Selling Stockholder.

Until 30 days after receipt of such notice, the Non-Selling Stockholders shall have the right to elect to purchase all of the Offered Shares at the price offered by the prospective purchaser and specified in such notice.  Each Non-Selling Stockholder electing to purchase must

give timely written notice of its election to purchase to the Company and the Selling Stockholder specifying the number of Offered Shares such Stockholder desires to purchase hereunder. In the event that there is more than one Non-Selling Stockholder desiring to purchase the Offered Shares and they desire to purchase more Shares than the number of Offered Shares, then the Non-Selling Stockholders shall have the right to purchase the Offered Shares, on a pro rata basis, based on the number of Shares then owned by such Non-Selling Stockholders. Such purchase shall be, at the option of the Non-Selling Stockholders, either on the payment terms specified in such notice or on the Agreement Terms (as defined in Section 3.5).

(b)    The Company's Rights to Purchase if the Non-Selling Stockholders Fail to Purchase All Offered Shares. If the Non-Selling Stockholders do not exercise their right to elect to purchase all of the Offered Shares within the 30-day period, the Company shall have the right to elect to purchase, by written notice to the Selling Stockholder within 15 days after the expiration of such 30-day period, the remaining Offered Shares at the price offered by the prospective purchaser. Such purchase shall be, at the option of the Company, either on the payment terms offered by the prospective purchaser or on the Agreement Terms.

After giving notice under this Section, the TPR Stockholders or the Non-TPR Stockholders, as the case may be, to which the Selling Stockholder belongs pursuant to Section 1.1(a) and their designees on the Board of Directors, shall refrain from participating as an officer, director or stockholder of the Company in the Company's decision whether to purchase any or all of the Offered Shares.

(c)    Failure of the Company and the Non-Selling Stockholders to Purchase Offered Shares. If elections to purchase all of the Offered Shares are not made by the Company and/or the Non-Selling Stockholders within the 45-day period granted for such purchases, then, subject to the

- 12 -

co-sale rights, if any, set forth in Section 4.1, including (if applicable) completion of the additional five plus 30-day period described therein, (i) if there are no Tag-Along Shares (as defined in Section 4.1(a)) then, all of the Offered Shares, and (ii) if there are Tag-Along Shares, then, in accordance with Section 4.1(c), the permitted number of Offered Shares and the Tag Along Shares, may be sold, assigned or transferred, pursuant to the Offer; provided that all of the Offered Shares (or, if applicable, the prorated Offered Shares and Tag-along Shares) are so transferred within 60 days of the expiration of (A) if co-sale rights are applicable, the 30-day period set forth in Section 4.1(b), and (B) if co-sale rights are not applicable the 15-day period set forth in Section 3.1(b), to the person or persons named in, and under the terms and conditions of, the Offer described in the notice to the Company and Non-Selling Stockholders pursuant to Section 3.1(a); provided, further, that such transfer requires the new stockholder(s) to (x) become a party to this Agreement and (y) comply with Section 3.2(a)(v) hereof; and provided, further, that such transfer complies with all applicable federal and state securities and other laws.

     3.2   <u>Right to Purchase Upon Certain Other Events</u>.

     (a)   <u>The Stockholders' Right of Purchase</u>.  The Covered Stockholders other than the hereinafter defined Terminating Stockholder (the "Purchasing Stockholders") shall have the right to elect to purchase the Shares held by a Stockholder (the "Terminating Stockholder," and such Shares held by such Terminating Stockholder are referred to as the "Terminating Shares") at the Agreement Price (as defined in Section 3.4) and on the Agreement Terms upon the occurrence of any of the following events for a period ending on the later of 60 days after determination of the Agreement Price for the Terminating Shares and 90 days after the Company and the Purchasing Stockholders receive notice from any source of the occurrence of any of the following events (each Stockholder agreeing to give the others and the Company notice of any such event promptly after

its knowledge of the occurrence thereof); <u>provided</u> that for purposes of this Section 3.2, if the Terminating Stockholder is (x) a TPR Stockholder, then only the Non-TPR Stockholders shall be deemed to be Purchasing Stockholders; and (y) a Non-TPR Stockholder, then only the TPR Stockholders shall be deemed to be Purchasing Stockholders.

(i)    the Terminating Stockholder pursuant to or within the meaning of any Bankruptcy Law (defined below): (A) admits in writing its inability to pay its debts generally as they become due; (B) commences a voluntary case or proceeding; (C) consents to the entry of an order for relief against it in an involuntary case or proceeding; (D) consents or acquiesces in the institution of a bankruptcy or insolvency proceeding against it; (E) consents to the appointment of a Custodian (defined below) of it or for all or substantially all of its property; or (F) makes a general assignment for the benefit of its creditors, or takes any action to authorize or effect any of the foregoing; or

(ii)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (A) is for relief against the Terminating Stockholder in an involuntary case or proceeding; (B) appoints a Custodian of the Terminating Stockholder or for all or substantially all of its property; or (C) orders the liquidation of the Terminating Stockholder; and in each case the order or decree remains unstayed and in effect for 30 days;

(iii)    any of the Terminating Stockholder's Shares are levied upon under a writ of execution or become subject to sale under any legal process which has not been terminated or vacated within 30 days;

(iv)    the Terminating Stockholder sells, pledges, encumbers, hypothecates or otherwise transfers any interest in (including any derivative transaction), or purports to sell, pledge, encumber, hypothecate or otherwise transfer any interest in (including any derivative

# Exhibit A

# STOCKHOLDERS AGREEMENT

This Stockholders Agreement is made and entered into as of March 30, 2001, among TPR Investment Associates, Inc., a Delaware corporation ("TPR"), TR Investors, LLC, a Delaware limited liability company ("Investors"), Glenclova Investment Co., a Cayman Islands corporation ("Glenclova"), and Trans-Resources, Inc., a Delaware corporation (the "Company").

WHEREAS, TPR, Investors and Glenclova directly and indirectly own 100% of the outstanding common stock, par value $.01 per share (the "Shares"), of the Company, as set forth on Schedule A hereto; and

WHEREAS, TPR, Investors, Glenclova and the Company wish to set forth certain agreements concerning the transfer of Shares, the management of the Company, and certain other matters as provided herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE 1

## MANAGEMENT

1.1    Stockholder Definitions; Voting of Shares

(a)    "TPR Stockholders" shall mean TPR and its Permitted Transferees (as defined in Section 2.1); "Initial Non-TPR Stockholders" shall mean Glenclova and Investors; and "Non-TPR Stockholders" shall mean the Initial Non-TPR Stockholders and their Permitted Transferees. The TPR Stockholders together with the Non-TPR Stockholders are collectively called the "Covered Stockholders." "Stockholders" is defined in Section 6.1; provided, however, that solely for the purposes of Sections 1.1(b), 1.2 and 1.3 a Stockholder which is not a Permitted Transferee shall be

238061.20

deemed either a TPR Stockholder or a Non-TPR Stockholder (and hence a Covered Stockholder), based on which of these two groups it acquired its Shares from.

(b)    Each TPR Stockholder and Non-TPR Stockholder shall vote all Shares owned by it, or as to which it has voting power, pursuant to the provisions of this Agreement.

1.2    Election of Directors

For so long as the Covered Stockholders own a majority of the outstanding Shares, the Board of Directors shall consist of six members, and in electing directors of the Company, the Covered Stockholders shall vote for the following candidates, which the Company shall take all necessary steps to nominate:

(a)    If the TPR Stockholders own a majority of the outstanding Shares, four candidates designated by the TPR Stockholders and for so long as the Non-TPR Stockholders own at least 15% of the Shares initially purchased (the "Exchange Shares") pursuant to the Exchange Agreement with the Company, dated the date hereof, two candidates designated by the Representatives (as defined in Section 1.7). TPR will use its best efforts, after consultation with the Representatives, to assure that at least two of its candidates are "outside" directors, i.e., persons who are not officers of TPR or any of its subsidiaries, immediate family members of Arie Genger, or persons who have received material direct or indirect compensation from TPR or any of its subsidiaries during the two immediately preceding or the current fiscal year; and

(b)    If the TPR Stockholders own 50% of the outstanding Shares and the Non-TPR Stockholders own at least 50% of the Exchange Shares, three candidates designated by the TPR Stockholders and three candidates designated by the Representatives and if the Non-TPR Stockholders own less than 50% of the Exchange Shares and at least 15% of the Exchange Shares,

four candidates designated by the TPR Stockholders and two candidates designated by the Representatives.

(c)     If the TPR Stockholders own less than 50% of the outstanding Shares, the group owning the greater number of Shares as between the TPR Stockholders and the Non-TPR Stockholders shall designate four directors and the other group shall, so long as it owns a number of Shares equal to at least 15% of the Exchange Shares, designate two directors.

For the purposes of this Section 1.2, in calculating the percentage of Exchange Shares owned by the Non-TPR Stockholders, the Balance Shares (as defined in Section 1.6) shall be deemed owned by the Non-TPR Stockholders.

1.3     Removal of Directors and Vacancies

During such time as the provisions of Section 1.2 remain in effect (the "Effective Period") no director shall be removed except by the affirmative vote of the party or group entitled to elect such director. If such party or group specify the removal of a director, the Stockholders agree to vote all Shares owned by them, or as to which they have voting power, for the removal of such director. If a vacancy occurs on the Board of Directors during the Effective Period, the remaining directors shall immediately elect the nominee of the party or group that nominated the departing director. If the remaining directors fail for any reason to elect such nominee, the Company or the Stockholders shall cause a stockholders' meeting to be held at the earliest practicable date, at which meeting the Stockholders shall vote, pursuant to this Agreement, all Shares owned by them, or as to which they have voting power, for such nominee.

1.4     Protective Provisions.

(a)     Without the written consent of not less than 66⅔% of the then outstanding Shares (in the case of the Non-TPR Stockholders, acting through the Representatives), the Company shall not, and will not permit any of its subsidiaries to:

- 3 -

        (i)     sell, convey, or otherwise dispose of all or substantially all of the property or business of the Company and its subsidiaries taken as a whole, or merge the Company or any material subsidiary thereof into, or consolidate the Company or any material subsidiary thereof into, any other corporation, except into another wholly-owned subsidiary of the Company;

        (ii)    except pursuant to Sections 5.2 or 5.3 hereof or the registration rights granted to Bank Hapoalim under its stock option for Shares (the "Bank's Shares Option"), engage in a registered public offering of the Company's Shares or any other Company securities, or the shares or securities of any subsidiary thereof;

        (iii)    make during any fiscal year aggregate capital expenditures in an amount exceeding 150% of the consolidated depreciation expense for the Company for the prior fiscal year;

        (iv)    acquire or dispose of any asset, property or investment which is material to the Company and its subsidiaries taken as a whole, except pursuant to the outstanding stock option granted to Bank Hapoalim with respect to the ordinary shares of the Company's subsidiary, Haifa Chemicals Ltd. (the "HCL Shares Option");

        (v)     mortgage, pledge or otherwise encumber any asset or property which is material to the Company and its subsidiaries taken as a whole;

        (vi)    enter into any joint venture material to the Company and its subsidiaries taken as a whole;

        (vii)   invest in any person or entity the business of which is not related to the Company's consolidated business;

(viii)  out of the ordinary course of business, enter into, amend or terminate any agreement providing for payments or receipts over the term of such agreement in excess of $1,000,000;

(ix)  out of the ordinary course of business, make any loan to a third party or enter into a guarantee of the obligations of a third party;

(x)  remove or replace the Company's independent auditor, or retain, or permit any of its subsidiaries to retain, any investment banking firm in connection with any acquisition or divestiture material to the Company and its subsidiaries taken as a whole or any securities offering;

(xi)  issue, redeem or repurchase any shares of capital stock, stock options or other rights for the issuance or sale of shares of capital stock of the Company or any of its subsidiaries, except pursuant to the Bank's Shares Option and the HCL Shares Option, or make any dividends or distributions on account of any such securities of the Company or any subsidiary thereof not directly or indirectly wholly-owned by the Company, except for dividends on the Shares in an aggregate annual amount not exceeding 25% of the Company's net income for such year;

(xii)  materially change the consolidated business of the Company;

(xiii)  reclassify, recapitalize or otherwise materially change the Shares or any shares of capital stock of a material subsidiary of the Company;

(xiv)  amend the Company's Certificate of Incorporation or by-laws;

(xv)  make any assignment for the benefit of creditors or commence any proceeding under a Bankruptcy Law (as defined in Section 3.2(b)(i)) for the Company or any material subsidiary of the Company;

(xvi) cause the liquidation, dissolution or winding up of the Company or any material subsidiary of the Company, or

(xvii) cause the Company to enter into any compensation arrangement with an affiliate of any Stockholder or cause any subsidiary to enter into any compensation arrangement with an affiliate of any Stockholder for a senior management position unless such arrangement is reasonable and has been approved by the Board of Directors of the Company (at a meeting or by consent in which the two "outside" directors designated by the TPR Stockholders were present); or enter into any other transaction in which any affiliate of a Stockholder has a direct or indirect interest, whether contingent or otherwise. (For purposes of this clause (xvii) an "affiliate" of a Stockholder shall include immediate family members and lineal descendants of the controlling person of such Stockholder.)

(b)    TPR and the Company are parties to a tax-sharing agreement, dated as of December 31, 1991 ("Tax Sharing Agreement"). The parties agree that concurrently herewith the Company will enter into the First Amendment to Tax Sharing Agreement in the form annexed hereto as Schedule B.

1.5    <u>Financial Information</u>.    The Company shall furnish the following financial information to each Stockholder which holds at least 5% of the outstanding Shares and to each Non-TPR Stockholder, so long as all Non-TPR Stockholders hold at least 15% of the Exchange Shares, if and when furnished to any executive officer or director of the Company or to TPR in its capacity as majority stockholder: annual, quarterly and monthly Company financial statements; Company projections; and any other material reports from the Company to TPR regarding the Company's performance or prospects.

1.6   <u>Share Distributions</u>. On the date hereof TPR owns 52.85% of the outstanding Shares and Investors and Glenclova collectively own 47.15% of the outstanding Shares. The Covered Stockholders agree that if any distributions are hereafter made on the Shares whether by dividend, liquidating distribution or otherwise (the aggregate amount of each such distribution to all Stockholders is hereinafter referred to as the "Distribution"), TPR agrees to transfer (a) if the Distribution is made before the exercise of the Bank's Shares Option, 1.85% of each Distribution and (b) if made after the exercise of the Bank's Shares Option, 1.785% of each Distribution, to one of the Representatives on behalf of the Non-TPR Stockholders as long as the Non-TPR Stockholders own any Shares. If at any time (i) the TPR Stockholders' aggregate percentage ownership of Shares becomes less than a majority of the outstanding Shares, (ii) the Bank's Shares Option is not exercised and terminates or (iii) the Shares issued to the Bank pursuant to the Bank's Shares Option are repurchased by the Company, TPR shall transfer or cause to be transferred such number of Shares (the "Balance Shares") to the then Non-TPR Stockholders, pro rata in accordance with their stockholdings, so that had such Shares been included in the Exchange Shares the Non-TPR Stockholders aggregate percentage ownership of Shares would upon issuance of the Exchange Shares have been 49% of the outstanding Shares, and upon such transfer of Shares TPR's obligation to transfer portions of Distributions shall terminate.

1.7   <u>Stockholder Representative; Power of Attorney</u>. Each Initial Non-TPR Stockholder hereby appoints and constitutes, and covenants and agrees that any Permitted Transferee thereof will appoint and constitute as a condition precedent to any such transfer, Investors and Glenclova or any of their respective designees as agents and attorneys-in-fact for the Non-TPR Stockholders (the "Representatives"), <u>provided</u> that there shall be no more than a total of two Representatives, for and on behalf of the Non-TPR Stockholders, to receive notices and communications hereunder and for

238061.20

transaction), any of its Shares, except as permitted by and in full compliance with the terms of this Agreement; or

(v)    the occurrence of a Change in Control (as hereinafter defined) with respect to the Terminating Stockholder. Each initial Stockholder represents and warrants to the other Stockholders that its own stockholder(s) and their stockholdings, in each case as of the date hereof, are accurately set forth on such Stockholder's Schedule 3.2 annexed hereto, and each Stockholder covenants and agrees with the Company and the other Stockholders that it shall not transfer any Shares unless (in addition to complying with all other provisions hereof applicable to the transfer), it shall have caused the transferee to deliver a representation and warranty and schedule to the foregoing effect (and as to the Initial Controlling Person (as defined below) of such transferee Stockholder) as to such transferee as of the date of the transfer.

(b)    <u>Defined Terms Used Herein.</u>    (i) "Bankruptcy Law" means Title 11, U.S. Code or any similar federal, state or foreign law for the relief of debtors. The term "Custodian" means any receiver, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law.

(ii)    "Change of Control" with respect to a Terminating Stockholder means the occurrence of any of the following events: (x) the Initial Controlling Person of the Terminating Stockholder or (but only if the result of the Initial Controlling Person's death or permanent disability) one or more Permitted Family Members of the Initial Controlling Person of a Terminating Stockholder (as defined below), fail to maintain beneficial ownership of at least a majority of the total voting power and equity (or comparable) interests of the Terminating Stockholder (in the case of the Non-TPR Stockholders, fail to maintain control (directly or indirectly) of at least 30% of the total voting power and ownership of at least 20% of the equity (or comparable interests) of the

Terminating Stockholder; provided, however, that no other person or group directly or indirectly controls 30% or more of the voting power of the Terminating Stockholder) or (y) the Terminating Stockholder consolidates with, or merges with or into, another entity unless the Initial Controlling Person of the Terminating Stockholder or (but only if the result of the Initial Controlling Person's death or disability) the Permitted Family Members of the Initial Controlling Person of the Terminating Stockholder beneficially own a majority of the total voting power and equity interests of the surviving entity (in the case of the Non-TPR Stockholders, controls at least 30% of the voting power and at least 20% of the equity (or comparable interests) of the surviving entity; provided, however, that no other person or group directly or indirectly controls 30% or more of the voting power of the surviving entity).

(iii)    "Initial Controlling Person" of a Stockholder means (x) with respect to TPR, Arie Genger; (y) with respect to the Initial Non-TPR Stockholders, the Trust; and (z) in the case of any other Stockholder who hereafter becomes a party hereto, means the natural person or entity who on the date it first becomes a Stockholder beneficially own the majority of the voting and equity (or comparable) interests of such Stockholder.

(iv)    "Permitted Family Member of the Initial Controlling Person of a Terminating Stockholder" means (A) the estate, immediate family members (in the case of TPR, including the current beneficial owners of TPR, each of which is currently a member of the immediately family of Arie Genger) or lineal descendants of such Initial Controlling Person, (B) each trust, all of whose beneficiaries-in-interest are one or more persons named in clause (A) of this definition and (C) any entity a majority of the total voting power and equity interests of which are beneficially owned by one or more persons or entities named in clause (A) of this definition.

(c)    Proration. In the event that there is more than one Purchasing Stockholder desiring to purchase the Terminating Shares and they desire to purchase more Shares than the aggregate number of Terminating Shares, then the Purchasing Stockholders shall have the right to purchase on a pro rata basis based on the number of Shares then owned by such Stockholders.

(d)    The Company's Right to Purchase on the Stockholder's Refusal. In the event the Purchasing Stockholders do not elect to purchase all of the Terminating Shares, the Company shall have the right to elect, within 15 days after the expiration of the period set forth in the first paragraph of Section 3.2(a), to purchase any remaining Terminating Shares, at the Agreement Price and on the Agreement Terms. The TPR Stockholders or the Non-TPR Stockholders, as the case may be, to which the Terminating Stockholder belongs pursuant to Section 1.1(a) and their designees on the Board of Directors shall refrain from participating as an officer, director or stockholder of the Company in the Company's decision whether to purchase any or all of the Terminating Shares.

3.3    Manner of Exercise. (a) Any right to purchase under Section 3.2 shall be exercised by giving written notice of election to the Company and the Terminating Stockholder or its legal representative, as the case may be, prior to the expiration of such right to purchase. Such notice shall be given as provided in Section 6.5 hereof.

(b)    The Terminating Stockholder shall not be obligated to sell its Shares, and the Purchasing Stockholders and the Company shall not be obligated to purchase such Shares pursuant to their elections, unless pursuant to Sections 3.2(a) and (d) the Purchasing Stockholders and the Company have elected to purchase in the aggregate all the Terminating Shares.

3.4    Agreement Price.

(a)    The "Agreement Price" shall be the fair value ("Fair Value") of the Shares to be purchased on a fully diluted basis, calculated on the basis of the Company as a going concern.

Initially, the Board of Directors of the Company, in good faith in the exercise of its reasonable business judgment, shall determine the Fair Value of the Shares. The Company shall notify the Stockholders (or their representatives) as soon as possible of such determination, but in any event, not later than 30 days after the date giving rise to the right to purchase such Terminating Shares. Unless the Terminating Stockholder or any Purchasing Stockholder notifies the Company within 15 days after the date of such notice of their objection to the proposed Fair Value, then the Fair Value proposed in the Company's notice shall be binding and conclusive.

        (b)    If any Purchasing Stockholder or the Terminating Stockholder notifies the Company of its objection in writing within such 15-day period and if the Company, the Purchasing Stockholders and the Terminating Stockholder (or their representatives) cannot mutually agree on the Fair Value of such Shares within 10 days after the date of the notice of objection, then the Fair Value of the Shares shall be determined by an independent appraiser selected jointly by the Purchasing Stockholders and the Terminating Stockholder (or their representatives). The determination of Fair Value by that appraiser shall be binding and conclusive on all parties to this Agreement. If the parties are unable to agree on the selection of an appraiser within 10 days after the expiration of the 10-day period referred to in the prior sentence, the Purchasing Stockholders (as a unit) and Terminating Stockholder shall each select an independent appraiser within five days after the expiration of said 10 days. The two appraisers so selected shall each independently appraise the Shares within 30 days of their appointment and, as long as the difference in the two appraisals does not exceed five percent of the lower of the two appraisals, the Fair Value shall be conclusively deemed to equal the average of the two appraisals. If either party fails to select an independent appraiser within the time required by this paragraph or if their appraiser fails to deliver their appraisal to the Company and the other parties within the above-mentioned 30-day period, the Fair

Value of the Shares shall be conclusively deemed to equal the appraisal of the independent appraiser timely selected by the other or timely delivered to the Company, as the case may be. If the difference between the two appraisals referred to above exceeds five percent of the lower of the two appraisals, the two appraisers selected shall select a third appraiser within five business days after delivery of both appraisals, who shall select one of the two appraisals, upon which such appraisal shall be conclusively deemed to be the Fair Value of the Shares. The Stockholders shall share equally (in proportion to their Share ownership) the fees and expenses of the appraisers jointly named, but the Terminating Stockholder and the Purchasing Stockholders, as the case may be, shall be responsible for the fees and expenses of any appraiser named solely by them. The Terminating Stockholder and the Purchasing Stockholders, as the case may be, shall bear their own expenses in presenting evidence to the appraisers. The Company will provide all information relating to itself reasonably requested by the Terminating Stockholder and the Purchasing Stockholders to the appraisers at its own expense.

3.5  Agreement Terms. "Agreement Terms" shall mean 100% of the purchase price, which shall be payable in the form of a certified check or by wire transfer at the Closing of such purchase and sale. Any payment by a purchaser may be reduced by any indebtedness from the Selling Stockholder or Terminating Stockholder, as the case may be, to the purchaser.

3.6  Delivery of Shares and Closing Date. Within thirty (30) days after the the exercise of the election to purchase all Offered Shares under Section 3.1 or all Terminating Shares under Section 3.2, the Selling Stockholder or the Terminating Stockholder or its legal representatives, as the case may be, shall deliver certificates representing the Shares to be sold, properly endorsed for transfer, and with the necessary documentary and transfer tax stamps, if any, affixed, to the Stockholders or the Company, as the case may be, which are purchasing such Shares. Payment of

the purchase price therefor shall concurrently be made to the Selling Stockholder or Terminating Stockholder or its personal representatives, as the case may be. Such delivery and payment shall be made at the principal office of the Company or at such other place as the parties mutually agree. Notwithstanding the above, any such transfer shall not be consummated unless it complies with all federal and state securities and other laws.

3.7    Additional Limitations on Transfers.

Notwithstanding anything to the contrary contained in this Agreement, each Stockholder agrees that it will not, directly or indirectly, without the written consent of the Company, effect or permit a transfer of Shares or of an interest in such Stockholder to a person known by the transferor, after due inquiry, to be a competitor of the Company or an affiliate of such a competitor.

## ARTICLE 4

### CO-SALE RIGHTS

4.1    Co-Sale Provisions.

(a)    Subject to Section 2.1, Section 3.1 and Article 5 hereof, in the event that, pursuant to the terms and provisions of this Agreement, a TPR Stockholder (the "Selling Stockholder") proposes to offer for sale or otherwise transfer any Shares to any person or entity (individually a "Third Party" and collectively, "Third Parties"), directly or indirectly, such sale or other disposition to a Third Party shall not be permitted unless the Selling Stockholder shall offer (or cause the Third Party to offer) the Stockholders other than TPR Stockholders (the "Co-Selling Stockholders") the right to elect to include, at the sole option of such Co-Selling Stockholders, in the sale to the Third Party such number of Shares owned by such Co-Selling Stockholders as permitted under Section 4.1(b) and (c) below (the "Tag-Along Shares").

(b)    The Selling Stockholder shall deliver a notice of co-sale rights (the "Co-Sale Notice") to the Company and the Co-Selling Stockholders within five days after the expiration of the 45-day period for purchases set forth in Section 3.1 above. Within 30 days after the giving of such Co-Sale Notice, the Co-Selling Stockholders may elect to include a number of their respective Shares as Tag-Along Shares (up to the percentage set forth in paragraph (c) below) in such a sale or other disposition (the "Inclusion Election"). Each Co-Selling Stockholder shall notify the Company and the Selling Stockholder of its Inclusion Election within such 30-day period. Any Co-Selling Stockholder electing to sell Tag-Along Shares shall also promptly deliver to the Company a stock certificate or certificates representing the number of Tag-Along Shares, together with a limited power-of-attorney authorizing the Selling Stockholder to sell or otherwise dispose of such Tag-Along Shares pursuant to the terms of such Third Party's offer.

(c)    Each Co-Selling Stockholder shall have the right to sell pursuant to the Third Party's offer its pro rata portion (that proportion of such Co-Selling Stockholder's Shares as the number of Shares it holds bears to the total number of Shares held by all Stockholders electing to sell) of the number of Offered Shares to be sold to the Third-Party, and the Selling Stockholder shall sell the balance of the number of Offered Shares set forth in the notice referred to in Section 3.1(a).

(d)    The purchase of the Tag-Along Shares shall close concurrently with the Third Party's purchase of the Selling Stockholder's Shares and shall be on the same terms and conditions, including the price per share, as are received by the Selling Stockholder and stated in the notice referred to in Section 3.1(a).

(e)    Promptly (but in no event later than five business days) after the consummation of the sale or other disposition of Shares of the Selling Stockholder to the Third Party pursuant to the Third Party's offer, the Selling Stockholder shall (i) notify the Co-Selling

Stockholders electing to sell Shares of the completion thereof, (ii) cause to be remitted to such Co-Selling Stockholders the total sales price attributable to the Tag-Along Shares sold by it, and (iii) furnish such other evidence of the completion and time of completion of such sale or other disposition.

(f)     If no Stockholder has elected to make an Inclusion Election, the Selling Stockholder shall have 60 days after the expiration of 30-day period referred to in Section 4.1(b) in which to sell or otherwise dispose of such Shares in accordance with Section 3.1(c) to the Third Party at a price and on terms not more favorable than were set forth in the Offer (as defined in Section 3.1(a)). If any Inclusion Election has been made, the Selling Stockholder shall have 60 days after the expiration of the 30-day period referred to in Section 4.1(b) in which to sell in accordance with Section 3.1(c) the Tag-Along Shares and the Selling Stockholder's Offered Shares permitted to be sold pursuant to the Third-Party's offer.

## ARTICLE 5

## PUT; REGISTRATION RIGHTS

5.1     Put.

(a) Commencing on January 1, 2009, but provided that no Put Withdrawal (as hereinafter defined) or registered underwritten public offering of Shares shall have occurred, any of the Non-TPR Stockholders, shall have the right for a period of twelve months from such date to require  the Company to purchase (the "Put") any (but not less than 25% of the Exchange Shares) or all of the Exchange Shares at the Agreement Price (as defined in Section 3.4, but replacing the term "Terminating Stockholder" with "Non-TPR Stockholders" and the term "Purchasing Stockholders" with the "Company"), and on the Agreement Terms, by (i) giving written notice of

the Put exercise to the Company, setting forth the number of Exchange Shares to be covered by the Put (the "Put Shares") and (ii) depositing in escrow with the Company's counsel stock certificates for the Put Shares, together with stock powers duly endorsed in blank (together with the above-mentioned exercise notice, the "Put Exercise") and thereafter furnishing to the Company such other documentation as the Company shall reasonably request. The first Agreement Price determined shall be used for all Put Exercises.

(b)     Within 60 days after the determination of the Agreement Price, the Company shall either complete the purchase of the Put Shares or cause the purchase of the Put Shares on the above-mentioned terms by another person or entity satisfactory to Stockholders holding a majority of the outstanding Shares (exclusive of the Non-TPR Stockholders and their Shares), unless within five business days after determination of the Agreement Price the Non-TPR Stockholder which exercised the Put gives written notice to the Company withdrawing the Put Exercise (a "Put Withdrawal"). If no Put Withdrawal shall have occurred and the purchase of the Put Shares shall not have been completed within the above-mentioned time period through no fault of any Non-TPR Stockholder (a "Put Default"), then the Non-TPR Stockholder which exercised the Put shall become entitled to the registration rights set forth in Section 5.2.

5.2    Requested Registration.

(a)    Request for Registration.  If following either: (x) a Put Default (but provided that no Put Withdrawal shall have occurred), the Company shall receive from Non-TPR Stockholders which have suffered a Put Default a written request that the Company effect a registration (as defined in Section 5.9) with respect to Put Shares covered by such Put Default ("Defaulted Put Shares"); or (y) the Company's completion of a registered underwritten public offering of its Shares, the Company shall receive a written request from any Non-TPR Stockholders

that the Company effect a registration with respect to Exchange Shares held by such Stockholders (the Non-TPR Stockholders making the request pursuant to either clause (x) or (y) being called the "Initiating Stockholders"); then, if the anticipated aggregate offering price, net of underwriting discounts and commissions, would exceed $10 million, the Company will:

(i)    promptly give written notice of the proposed registration to all other Non-TPR Stockholders and to the holders of the Option Shares (as defined in the Bank's Shares Option)(collectively, the "Eligible Stockholders"); and

(ii)    use its reasonable best efforts, as soon as practicable, to effect such registration (including, without limitation, appropriate qualification under applicable blue sky or other state securities laws and appropriate compliance with applicable regulations issued under the Securities Act and any other governmental requirements or regulations) as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such (A) Defaulted Put Shares as are specified in such request (in the case of a request pursuant to clause (x)) or Exchange Shares (in case of a request pursuant to the preceding clause (y)), in each case which are Registrable Securities (as defined in Section 5.9), together with all such other Exchange Shares which are Registrable Securities of any Non-TPR Stockholder and Option Shares as are specified in a written request received by the Company within 20 days after receipt of such written notice from the Company, and use its reasonable best efforts to file a registration statement under the Securities Act within 60 days of such request; provided, however, that the Company shall not be obligated to take any action to effect any such registration, qualification or compliance pursuant to this Section 5.2:

(A)    In any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, qualification

or compliance unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act;

(B)     Prior to six months after the effective date of the Company's initial registration statement relating to an underwritten public offering of the Company's securities filed under the Securities Act, or within six months after the effective date of any other registration statement relating to an underwritten public offering of the Company's securities filed under the Securities Act;

(C)     After the Company has effected four such registrations pursuant to this Section 5.2(a) and such registrations have been declared or ordered effective;

(D)     If the Company shall furnish to such Non-TPR Stockholders a certificate (1) signed by the Chief Executive Officer or President of the Company stating that in the good faith judgment of the Board of Directors it would be seriously detrimental to the Company or its stockholders for a registration statement to be filed in the near future, or (2) the Chief Financial Officer that any financial statements required as part of the registration statement are not then available, then the Company's obligation to use its best efforts to register, qualify or comply under this Section 5.2 shall be deferred for a period not to exceed 90 days from the date of receipt of written request from the Initiating Stockholders; provided, however, that the Company shall not exercise the rights pursuant to this clause (D) for more than an aggregate of 90 days in any 12 month period; or

(E)     During the period starting the date 60 days prior to the Company's good faith estimate of the date of the filing of, and ending on a date 180 days following the effective date of, a Company-initiated registration which includes securities being sold for the Company's own account, provided, that the Company is actively employing in good faith reasonable

efforts to cause such registration statement to become effective and provided further that the Company may define the boundaries of such period not more that once in any 12 month period.

Subject to the foregoing clauses (A) through (E), the Company shall file a registration statement covering the Registrable Securities so requested to be registered as soon as practicable after receipt of the request or requests of the Initiating Investors.

(b)     Underwriting. In the event that a registration pursuant to Section 5.2 is for a registered public offering involving an underwriting, the Company shall so advise the Eligible Stockholders as part of the notice given pursuant to Section 5.2.(a)(i). In such event, the right of any Non-TPR Stockholder to registration pursuant to Section 5.2 shall be conditioned upon such Non-TPR Stockholder's participation in the underwriting arrangements required by this subsection (b), and the inclusion of such Non-TPR Stockholder's Registrable Securities in the underwriting to the extent requested shall be limited to the extent provided herein.

The Company shall (together with all Eligible Stockholders proposing to distribute their Shares through such underwriting) enter into an underwriting agreement in customary form with the managing underwriter selected for such underwriting by a majority in interest of the Initiating Investors, but subject to the Company's reasonable approval. Notwithstanding any other provision of this Section 5.2, if the managing underwriter advises the Initiating Stockholders in writing that marketing factors require a limitation of the number of shares to be underwritten, then the Company shall so advise all Eligible Stockholders and the number of Shares that may be included in the registration and underwriting shall be allocated among all Eligible Stockholders thereof in proportion, as nearly as practicable, to the respective amounts of Registrable Securities and Option Shares held by such Eligible Stockholders at the time of filing the registration statement. No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing

limitation shall be included in such registration. To facilitate the allocation of shares in accordance with the above provisions, the Company or the underwriters may round the number of shares allocated to any Eligible Stockholders to the nearest 100 shares.

If any Non-TPR Stockholders disapproves of the terms of the underwriting, such person may elect to withdraw therefrom by written notice to the Company, the managing underwriter and the Initiating Investors. The Registrable Securities so withdrawn shall also be withdrawn from registration, and such Registrable Securities shall not be transferred in a public distribution prior to 180 days after the effective date of such registration, or such other shorter period of time as the underwriters may permit.

5.3     Company Registration.

(a)     Notice of Registration. If at any time or from time to time prior to January 1, 2010 the Company shall determine to file a registration statement, other than a registration relating solely to employee benefit plans, or a registration relating solely to the issuance of securities in a business combination, including a Rule 145 transaction, the Company will

(i)     promptly give the Representatives and the other Stockholders and the holder(s) of Option Shares written notice thereof; and

(ii)     include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities and Option Shares specified in a written request or requests, made within 20 days after receipt of such written notice from the Company, by any Stockholder or the holder(s) of Option Shares.

(b)     Underwriting. If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the

Representatives and the other Stockholders as a part of the written notice given pursuant to Section 5.3(a)(i). In such event, the right of any Stockholder to registration pursuant to Section 5.3 shall be conditioned upon such Stockholder's participation in such underwriting and the inclusion of such Stockholder's Registrable Securities in the underwriting to the extent provided herein.

All such Stockholders proposing to distribute their securities through such underwriting shall (together with the Company and other holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the managing underwriter selected for such underwriting by the Company. Notwithstanding any other provision of this Section 5.3, if the managing underwriter determines that marketing factors require a limitation of the number of shares to be underwritten, the managing underwriter may limit the Registrable Securities to be included in such registration. The Company shall so advise all such Stockholders and other holders distributing their securities through such underwriting and the number of Shares that may be included in the registration and underwriting shall be allocated first to the Company and then in proportion, as nearly as practicable, to the respective amounts of Shares held at the time of filing the registration statement by the other Stockholders and other holders of Company securities, in each case which have requested inclusion in the registration and underwriting. To facilitate the allocation of Shares in accordance with the above provisions, the Company may round the number of Shares allocated to any Stockholder or holder to the nearest 100 Shares. If any such Stockholder disapproves of the terms of any such underwriting, it may elect to withdraw therefrom by written notice to the Company and the managing underwriter. Any Shares excluded or withdrawn from such underwriting shall be withdrawn from such registration, and shall not be transferred in a public distribution prior to 180 days after the effective date of the registration statement relating thereto, or such other shorter period of time as the underwriters may require.

238061 20

- 28 -

(c)     Right to Terminate Registration.  The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 5.3 prior to the effectiveness of such registration, whether or not any such Stockholder has elected to include securities in such registration.

5.4    Expenses of Registration.    (a)  Except as set forth in paragraph (b) below, all Registration Expenses incurred in connection with the registrations pursuant to Sections 5.2 or 5.3 shall be borne by the Company.  All Selling Expenses relating to Shares registered on behalf of the Stockholders and any other expenses required to be borne by the selling stockholders shall be borne pro rata on the basis of the number of Shares so registered.

(b)     The Company shall not be required to pay for expenses of any registration proceeding begun pursuant to Section 5.2, the request for which is subsequently withdrawn by the Initiating Holders or Non-TPR Stockholders for reasons other than a material adverse change in the business or financial condition of the Company occurring prior to the effectiveness of such registration statement, in which case, such expenses shall be borne by the Initiating Holders or the Non-TPR Stockholders requesting such withdrawal, pro rata on the basis of the number of Shares so included in the registration request unless Non-TPR Stockholders of a majority of Registrable Securities held by Non-TPR Stockholders agree to forfeit their right to the requested registration pursuant to Section 5.2(a) in which event such right shall be forfeited by all Non-TPR Stockholders.

5.5    Registration Procedures.  In the case of each registration effected by the Company pursuant to this Article 5, the Company will keep each Stockholder included therein advised in writing as to the initiation of each registration and as to the completion thereof.  The Company will:

(a)     Prepare and file with the Commission a registration statement with respect to such Shares and use its diligent efforts to cause such registration statement to become effective,

238061.20                                          - 29 -

and, upon the request of the Stockholders of a majority of the Registrable Securities registered thereunder, keep such registration statement effective for up to the earlier of 45 days or until the Stockholders have completed the distribution relating thereto;

(b)    Prepare and file with the Commission such amendments and supplements to such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement;

(c)    Furnish to the Stockholders included therein such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them;

(d)    Use its reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Stockholders included therein, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions;

(e)    In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering. Each Stockholder participating in such underwriting shall also enter into and perform its obligations under such an agreement; and

(f)    Notify each Stockholder of Shares covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material

fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

5.6    Indemnification.

(a)    To the extent permitted by law, the Company will indemnify each Stockholder, each of its officers and directors and partners, and each person controlling such Stockholder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification or compliance has been effected pursuant to this Article 5, and each underwriter, if any, and each person who controls any underwriter within the meaning of Section 15 of the Securities Act, against all expenses, claims, losses, damages or liabilities (or actions in respect thereof), including any of the foregoing incurred in settlement of any litigation, commenced or threatened, arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, prospectus, offering circular or other document, or any amendment or supplement thereto, incident to any such registration, qualification or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, or any violation by the Company of the Securities Act or any rule or regulation promulgated under the Securities Act or any other federal, state or common law rule or regulation applicable to the Company in connection with any such registration, qualification or compliance, and the Company will reimburse each such Stockholder, each of its officers and directors, and each person controlling such Stockholder, each such underwriter and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating, preparing or defending any such claim, loss, damage, liability or action, as such expenses are incurred; provided that the Company will not be liable in any such case to the extent

that any such claim, loss, damage, liability or expense arises out of or is based on any untrue statement or omission, or alleged untrue statement or omission, made in reliance upon and in conformity with written information furnished to the Company by an instrument duly executed by such Stockholder, controlling person or underwriter and stated to be specifically for use therein.

(b)    To the extent permitted by law, each Stockholder will, if Shares held by such Stockholder are included in the securities as to which such registration, qualification or compliance is being effected, indemnify the Company, each of its directors and officers, each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 16 of the Securities Act, and each other such Stockholder, each of its officers and directors and each person controlling such Stockholder within the meaning of Section 16 of the Securities Act, against all claims, losses, damages and liabilities (or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company, such Stockholders, such directors, officers, persons, underwriters or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular or other document in reliance upon and in conformity with written information furnished to the Company by an instrument duly executed by such Stockholder and stated to be specifically for use therein. Notwithstanding the foregoing, the liability of each Stockholder under this subsection (b) shall be limited to an amount

equal to the public offering price of the Shares sold by such Stockholder, unless such liability arises out of or is based on willful misconduct by such Stockholder.

(c)     Each party entitled to indemnification under this Section 5.6 (the "Indemnified Party") shall give notice to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of any such claim or any litigation resulting therefrom; provided that counsel for the Indemnifying Party, who shall conduct the defense of such claim or litigation, shall be approved by the Indemnified Party (whose approval shall not unreasonably be withheld), and the Indemnified Party may participate in such defense at such Indemnified Party's expense; and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 5.6 unless the failure to give such notice is materially prejudicial to an Indemnifying Party's ability to defend such action and provided further, that the Indemnifying Party shall not assume the defense for matters as to which there is a conflict of interest or separate and different defenses. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. No Indemnified Party shall consent to entry of any judgement or enter into any settlement without the consent of the Indemnifying Party, which consent shall not be unreasonably withheld.

(d)     If the indemnification provided for in this Section 5.6 is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to therein, then the Indemnifying Party, in lieu of indemnifying

such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e)    Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

5.7    <u>Information by Holders</u>. The Stockholders of Shares included in any registration shall furnish to the Company such information regarding such Stockholder, such Registrable Securities held by them and the distribution proposed by such Stockholder as the Company may request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Article 5.

5.8    <u>Transfer of Registration Rights</u>. The rights to cause the Company to register Shares may be assigned only (a) in the case of rights under Section 5.2, to Permitted Transferees who have become such in compliance with this Agreement, and (b) in the case of Section 5.3, to Stockholders who have become such in compliance with this Agreement.

5.9    <u>Certain Definitions</u>. As used in this Article 5, the following terms have the following respective meanings:

"Commission" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"Registrable Securities" means the Exchange Shares (as defined in Section 5.1); provided, however, that the Exchange Shares shall no longer be treated as such Registrable Securities if (A) they have been sold to or through a broker or dealer or underwriter in a public distribution or a public securities transaction, (B) they have been sold in a transaction exempt from the registration and prospectus delivery requirements of the Securities Act so that all transfer restrictions and restrictive legends with respect thereto are removed upon consummation of such sale, (C) in the case of a Stockholder who then holds less than 1% of the then outstanding Shares, the shares are available for sale, in the opinion of counsel to the Company, without compliance with the registration and prospectus delivery requirements of the Securities Act so that all transfer restrictions and restrictive legends with respect thereto may be removed upon the consummation of such sale, or (D) all such Shares held by a Stockholder may be sold under Rule 144 of the Securities Act within a three month period without regard to volume limitations and the average weekly trading volume of the Shares during the preceding three months is equal to or in excess of the number of Shares held by such Stockholder.

The terms "register," "registered" and "registration" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of the effectiveness of such registration statement.

"Registration Expenses" shall mean all expenses, except as otherwise stated below, incurred by the Company in complying with Sections 5.2 or 5.3 hereof, including, without limitation,

all registration, qualification and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company, blue sky fees and expenses, the expense of any special audits incident to or required by any such registration (but not including the expense of any special audits incident to or required by any such registration where the Company is not registering any of its securities, excluding the compensation of regular employees of the Company which shall be paid in any event by the Company), but shall not include Selling Expenses and fees and disbursements for counsel for Stockholders.

"Selling Expenses" shall mean all underwriting discounts, selling commissions and stock transfer taxes applicable to the securities registered for Stockholders.

## ARTICLE 6

### MISCELLANEOUS

6.1    Additional Stockholders.  Until this Agreement is terminated, all transferees of a Stockholder's Shares shall execute and deliver to the Company a written agreement, in form and content satisfactory to the Company, agreeing to be bound by all of the obligations, terms and conditions of this Agreement applicable to Stockholders or parties hereto; but (except for the limited purposes provided in Section 1.1(b)) only Permitted Transferees shall be deemed Covered Stockholders and (as applicable) TPR Stockholders or Non-TPR Stockholders.  The term "Stockholder" as used herein shall be deemed to include the initial parties hereto and all successive transferees in accordance with this Agreement. All references to numbers of Shares contained herein shall be adjusted to reflect any stock splits, stock dividends or recapitalizations.

6.2    <u>Representatives and Assigns</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, their legal representatives, and transferees in accordance with this Agreement, except as otherwise set forth herein.

6.3    <u>Violations or Remedies</u>. The parties agree that any violation of this Agreement (other than a default in the payment of money) cannot be compensated for by damages, and any aggrieved party shall have the right, and is hereby granted the privilege, of obtaining specific performance of this Agreement in any court of competent jurisdiction in the event of any breach hereunder.

6.4    <u>Governing Law; Jurisdiction; Choice of Forum</u>. The parties agree that the exclusive place of jurisdiction for any action, suit or proceeding relating to this Agreement shall be in the courts of the United States of America sitting in the Borough of Manhattan in the City of New York or, if such courts shall not have jurisdiction over the subject matter thereof, in the courts of the State of New York sitting therein, and each such party hereby irrevocably and unconditionally agrees to submit to the jurisdiction of such courts for purposes of any such action, suit or proceeding. Each party hereto irrevocably waives any objection it may have to the venue of any action, suit or proceeding brought in such courts or to the convenience of the forum. Final judgment in any such action, suit or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and the amount of any indebtedness or liability of any party therein described. Service of process required to be made (i) on any Non-TPR Stockholder in any such suit may be on any member of the firm of Jenkens & Gilchrist Parker Chapin LLP or any successor firm and (ii) on the Company or any TPR Stockholder in any such suit may be made or any member of the firm of RubinBaum LLP or any successor firm.

6.5    Notices. All notices required to be delivered pursuant to this Agreement shall be delivered in person or by telegraphic or other facsimile transmission or sent by certified mail, return receipt requested, and shall be addressed to the Company at its principal business office, to the attention of its Chief Executive Officer, to a Non-TPR Stockholder to the Representatives, and to any other Stockholder at the address of the Stockholder shown in the Company's stock ledger or to such other address as such other Stockholder may indicate by duly giving written notice to the Company.

6.6    Severability. If any term or condition of this Agreement, or application thereof to any person or circumstance, shall to any extent be held invalid or unenforceable, the remainder of this Agreement, or application of such term or condition to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and shall remain in full force and effect.

6.7    Amendment. This Agreement may be modified or amended in whole or in part by a written instrument signed by the Company, each of TPR, Investors and Glenclova which are then individually Stockholders of not less than 10% of the outstanding Shares, and by Covered Stockholders then owning not less than 80% of the Shares held by all Covered Stockholders, upon which such modification or amendment will be binding on all Stockholders.

6.8    No Waiver. No delay or failure on the part of a Company or a Stockholder in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any of them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.

6.9    Integration. This Agreement embodies the entire agreement and understanding of the patties hereof in respect of the actions and transactions contemplated by this Agreement. This

Agreement supersedes all other prior written or oral understandings between and among the parties hereto relating to the subject matter hereof.

6.10    Termination of this Agreement. This Agreement shall terminate upon the earlier of (i) the written agreement of each of TPR, Investors and Glenclova which are then individually Stockholders of not less than 10% of the outstanding Shares, and by Covered Stockholders then owning not less than 80% of the Shares held by all Covered Stockholders, (ii) the sale of all of the outstanding shares of capital stock of the Company to a third party or (iii) the final liquidation, dissolution and winding-up of the Company.

6.11    Counterparts. This Agreement may be executed in any number of counterparts; each of which, when so executed, shall be deemed an original.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year above written.

TRANS-RESOURCES, INC.

By: _____
    Name:
    Title:

STOCKHOLDERS:

TPR INVESTMENT ASSOCIATES, INC.

By: _____
    Name:
    Title:

TR INVESTORS, LLC

By: _____
    Name: Mark S. Hirsch
    Title:  Senior Vice President

GLENCLOVA INVESTMENT CO.

By: _____
    Name:  Robert Smith
    Title:  Chairman

Solely for purposes of the final sentence of Section 1.8.

_____
Arie Genger

238061.20

- 40 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year above written.

TRANS-RESOURCES, INC.

By:_____
      Name:
      Title:

STOCKHOLDERS:

TPR INVESTMENT ASSOCIATES, INC.

By:_____
      Name:
      Title:


TR INVESTORS, LLC

By: _____
      Name: Mark S. Hirsch
      Title:   Senior Vice President


GLENCLOVA INVESTMENT CO.

By:_____
      Name: Robert Smith
      Title: Chairman


Solely for purposes of the final sentence of Section 1.8.


_____
Arie Genger

## SCHEDULE A

| Stockholder | # of Shares of Common Stock |
| --- | --- |
| TPR Investment Associates, Inc. | 3,000 (52.85%) |
| TR Investors, LLC | 1,429.5856 (25.18%) |
| Glenclova Investment Co. | 1,246.8572 (21.97%) |

- 41 -

SCHEDULE B

FIRST AMENDMENT

TO

TAX SHARING AGREEMENT

THIS FIRST AMENDMENT TO TAX SHARING AGREEMENT, dated March 30, 2001, amends that certain Tax Sharing Agreement dated December 30, 1991, among TPR Investment Associates, Inc., a Delaware corporation ("Associates"), Trans-Resources, Inc., a Delaware corporation ("TRI"), Eddy Potash, Inc., a Delaware corporation ("Eddy"), Nine West Corporation, a Delaware corporation, TR Media Corporation, a Delaware corporation ("TR") and Cedar Chemical Corporation, a Delaware corporation ("Cedar"). Whereas the parties hereto desire to amend the Tax Sharing Agreement to include as parties any other subsidiaries of TRI included in the Associates Group (whether specifically mentioned herein or not) and to accommodate the deconsolidation of TRI and its subsidiaries from the Associates Group, for valuable consideration the sufficiency of which is hereby admitted, the Tax Sharing Agreement is amended as follows:

Section 1.    Consolidated Return Election.  is hereby amended to further provide that:

From and after the date TRI ceases to be a member of the Associates affiliated group, as defined in Code § 1504(a), TRI, Eddy, Nine West, TR and Cedar Group will no longer join in any consolidated return with Associates and will have no liability to Associates for any taxes for any periods subsequent to such date.

Section 2.    Agency and Information.  is hereby amended to further provide that:

Subject to Section 3 below, Associates shall file all Associates Consolidated Returns

for any Associates Consolidated Return Year and shall make all payments and prepayments of tax with respect to any such Associated Consolidated-dated Return Year. Furthermore, Associates' exercise of authority to act as sole agent for each of TRI, Eddy, Nine West, TR and the Cedar Group with respect to Associates Consolidated Return Years shall be subject to the limitations set forth in Sections 3, 10 and 11.

Section 3.     Cooperation. is hereby amended to further provide that:

Associates shall also cooperate with TRI with respect to Associates' filing of any return or consent relating to any Associates Consolidated Return Year. Associates further agrees to consider in good faith any such action as TRI may reasonably request, including but not limited to the filing of requests for the extension of time within which to file tax returns, and to cooperate in connection with any refund claim with respect to any Associates Consolidated Return Year.

Section 4.     TRI, Eddy, Nine West, TR and Cedar Liability to Associates. is hereby amended to further provide that:

The separate federal income tax liability amounts of TRI, Eddy, Nine West, TR and the Cedar Group shall be computed for purposes of this Section 4 by taking into account (to the extent not previously absorbed) the carryover or carryback of any net operating loss or capital loss or to any other loss, deduction, exemption, expense, credit or allowance (a "Loss") from any period, including but not limited to, the period in which such Loss is incurred.

Section 5.     No Liability to Associates.   is hereby amended to provide that:

For any Associates Consolidated Return Year for which a tax return has not been filed as of the date hereof, Associates shall be required to pay, at the time and in the manner provided in Section 9, to TRI an amount equal to the difference between (i) the federal income tax liability

245231.2                                     - 2 -

Associates would have incurred for such period if Associates filed a federal income tax return on a separate return basis computed without regard to any net operating loss or capital loss, carryover or carryback of any such loss, or any other loss, deduction, exemption, expense, credit or allowance attributable to TRI, Eddy, Nine West, TR or the Cedar Group, and (ii) the federal income liability Associates would have incurred for such period after giving effect to any such items attributable to TRI, Eddy, Nine West, TR or the Cedar Group.

Section 6.    Computations.  is hereby amended to include computations under Section 5.

Section 9.    Manner and Time of Payment under Section 4.    is hereby amended to provide that:

Each party shall pay all amounts due hereunder within three (3) business days of demand therefor.

Section 10.    Controversies with the I.R.S.    The first sentence of Section 10 is amended to provide that computations under Section 4 and Section 5 shall be adjusted consistently with any adjustments made by the Internal Revenue Service and agreed to by Associates and TRI, in a manner consistent with Sections 3, 6 and 11, or sustained in court. The last sentence of Section 10 is deleted.

Section 11.    Determinations and Calculations.    is hereby amended to provide that:

Subject to Sections 3, 6 and 10, any determination or calculation required to be made hereunder shall be made in accordance with the positions taken in preparing the Consolidated Return and shall be determined by Associates in good faith after considering such positions as TRI may reasonably request pursuant to procedures established by the Board of Directors of TRI, provided, however, that to the extent any determination, calculation or reporting position could materially favor Associates over TRI, it shall be deemed to be a "transaction in which an affiliate of a

Stockholder has a direct or indirect interest" subjecting such action to the provisions of Section 1.4(a)(xvii) of the Stockholders Agreement dated March 30, 2001 among Associates, TRI, TR Associates, LLC, a Delaware limited liability company and Glencova Investment Co., a Cayman Islands corporation..

Section 12.    Effect of TRI, Eddy, Nine West, TR or Cedar Leaving Associates Group. is hereby amended to further provide that:

Associates shall be required to pay to TRI, Eddy, Nine West, TR, Cedar or any Cedar Subsidiary any refund of tax actually received by Associates with respect to such carryback.

Section 15.    Notices.    is hereby amended to further provide that:

All notices required or desired to be given under the Tax Sharing Agreement shall also be delivered or sent to TRI at its principal place of business.

IN WITNESS HEREOF, the parties hereto have executed this FIRST AMENDMENT to TAX SHARING AGREEMENT as of the day and year first above written.

TPR INVESTMENT ASSOCIATES, INC.

By: _____
      Name:
      Title:

TRANS-RESOURCES, INC.

By: _____
      Name:
      Title:

EDP, INC. (formerly Eddy Potash, Inc.)

By: _____
       Name:
       Title:


NINE WEST CORPORATION

By: _____
       Name:
       Title:


TR MEDIA CORPORATION

By: _____
       Name:
       Title:


CEDAR CHEMICAL CORPORATION

By: _____
       Name:
       Title:

March 30, 2001

## Schedule 3.2

### for TPR Investment Associates, Inc.

Stockholders of TPR Investment Associates, Inc.:

Arie Genger                              250 shares of Common Stock
D&K Limited Partnership*          240 shares of Common Stock

---

\* a Delaware limited partnership of which Arie Genger's spouse, Dalia Genger, is General Partner and has a 4% interest and each of two separate trusts for Mr. Genger's two children is a limited partner with a 48% interest.